**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION**

**JAMES PARKS**                                                                                                            **PLAINTIFF**

**v.**                                                               **CIVIL ACTION NO.:** 3:24-cv-239-HTW-LGI

**OWENS & MINOR DISTRIBUTION, INC.; AND
O&M HALYARD, INC.**                                                **DEFENDANTS**

**COMPLAINT
<u>JURY TRIAL DEMANDED</u>**

     **COMES NOW** Plaintiff, James Parks, by and through counsel, Watson & Norris, PLLC, brings this action to recover damages for violations of his rights pursuant to Title VII of the Civil Rights Act of 1964 for race discrimination, 42 U.S.C.§1981 for race discrimination, the Age Discrimination in Employment Act (ADEA) for age discrimination, and the Americans with Disabilities Act (ADA) for disability discrimination against Defendants Owens & Minor Distribution, Inc., and O&M Halyard, Inc., collectively referred to as "O&M."   In support of this cause, Plaintiff would show unto the Court the following facts to-wit:

<u>**THE PARTIES**</u>

     1.     Plaintiff, James Parks, is an adult male resident of DeSoto County, Mississippi.

     2.     Defendant, Owens & Minor Distribution, Inc., is a Virginia corporation that may be served with process by serving its registered agent: C T Corporation System, 645 Lakeland East Drive, Suite 101, Flowood, Mississippi 39232.

     3.     Defendant, O&M Halyard, Inc., is a Virginia corporation that may be served with process by serving its registered agent: C T Corporation System, 645 Lakeland East Drive, Suite 101, Flowood, Mississippi 39232.

## JURISDICTION AND VENUE

4. This Court has federal question jurisdiction for actions that arise under Title VII, 42 U.S.C. § 1981, the ADEA and the ADA.

5. This Court has jurisdiction over the parties and venue is proper in this Court.

6. Plaintiff timely filed his Charge of Discrimination with the EEOC on July 29, 2023, a true and correct copy of which is attached as Exhibit "A." The EEOC issued a Notice of Right to Sue on February 13, 2024, a true and correct copy of which is attached as Exhibit "B." Plaintiff timely files these causes of action within ninety (90) days of receipt of his Notice of Right to Sue.

## STATEMENT OF FACTS

7. Plaintiff is a 64-year-old white male resident of DeSoto County, Mississippi.

8. Plaintiff was hired on May 1, 2001, as a maintenance worker at Excel Logistics, and the parent company was DHL Logistics.

9. For several years, Plaintiff worked for DHL, but they dropped the Excel name and went with the DHL name.

10. Plaintiff' position remained the same with the company, including his benefits.

11. During or around July 20, 2015, Plaintiff was promoted to the position of Maintenance Supervisor while the company was still under DHL.

12. On or around late December 2016/ early January 2017, O&M Halyard, Inc, dropped DHL as their primary shipping company and offered Plaintiff to stay with O&M Halyard, Inc.

13. In his job offer, Plaintiff was told that he would keep his benefits if he were to continue his employment with O&M Halyard, Inc. (O&M).

14. O&M is an employer as defined by Title VII.

15. O&M is an employer as defined by the ADEA.

16. O&M is an employer as defined by the ADA.

17. In January 2021, O&M hired Dwayne Napper as the new General Manager.

18. Around November or December 2022, Plaintiff was diagnosed with prostate cancer by Urologist Robert Hollabaugh at the Conrad Pearson Clinic in Southaven.

19. After he learned this, Plaintiff notified Mr. Napper (white male) about his (Plaintiff') diagnosis.

20. During or around February 2023, Plaintiff discussed possible treatments for his condition with Dr. Hollabaugh.

21. The resulting decision from that conversation was that Plaintiff would be treated with surgery.

22. During or around mid-February 2023, Plaintiff told Mr. Napper that he (Plaintiff) was going to need to undergo surgery soon, to address his medical condition.

23. On March 2, 2023, Mr. Napper gave Plaintiff a difficult choice: he could either accept a demotion from his position as Maintenance Supervisor to a lesser paying hourly position, i.e., a $12,000 per year pay cut; or, if he stayed in his current position, he would be placed on a Performance Improvement Plan and would likely be terminated soon.

24. Plaintiff reluctantly agreed to the demotion and when doing so, he was told by Mr. Napper that Mr. Napper "should have done this [the demotion] a long time ago."

25. During or around late March 2023, Plaintiff contacted New York Life, who handles FMLA leave for O&M, to request he be allowed to take FMLA leave.

26. Around April 6, 2023, Plaintiff learned that his former position of Maintenance Supervisor was given to substantially less qualified and less experienced Marcus Edwards (51-year-old black male).

27. On or around late March/early April 2023, Plaintiff learned that his FMLA leave was approved.

28. On April 14, 2023, Plaintiff began his FMLA leave.

29. On April 14, 2023, Plaintiff underwent surgery.

30. On or around July 1, 2023, Plaintiff returned to work.

31. At present, Plaintiff continues to work in the position to which he was demoted.

32. On or around July 29, 2023, Plaintiff filed an EEOC Charge of discrimination due to race and age against O&M.

33. On July 29, 2023, Plaintiff filed an amended Charge of Discrimination due to race, age, and disability against O&M.

34. On September 13, 2023, in response to Plaintiff' filed Charge, O&M submitted a Position Statement to the EEOC.

35. O&M's Position Statement alleges that "Plaintiff consistently performed below expectations as is evidenced by the copious informal and documented formal coaching he received."

36. Plaintiff contends this allegation is false.

37. Over the course of Plaintiff' 21-year tenure, he worked under multiple general managers.

38. During all that time, until Mr. Napper was hired as the General Manager in January 2021, Plaintiff' job performance reviews were consistently positive and affirming of his dedication, his excellent work ethic, and his ability to meet expectations.

39. When Mr. Napper started, however, he was critical and bullying in his approach to management.

40. Mr. Napper's expectations, for Plaintiff and for many other employees at O&M, were unrealistic in terms of both the time constraints reasonably associated with productivity and available resources.

41. O&M's Position Statement alleges that, "…instead of ultimately performance managing Plaintiff out of his role, his manager, Dwayne Napper…although having no obligation to do so, offered him a demotion…The demotion, which pays Plaintiff the same or more money, was accepted by Plaintiff…"

42. Plaintiff contends that this allegation is considerably disingenuous in its characterization of the situation in question.

43. Notably, about ten days before this interaction, Plaintiff had informed Mr. Napper that he (Plaintiff) had just been diagnosed with cancer and would need to undergo surgery to address the condition soon.

44. Despite being fully aware of this situation, Mr. Napper gave Plaintiff the following choice: he could remain in his current position and be placed on a Performance Improvement Plan (PIP) and then, as Mr. Napper noted, "It's downhill from there."

45. Plaintiff asked, "Does that mean being fired?" to which Mr. Napper replied, "Yes"; or Plaintiff could accept the hourly position, i.e., the demotion.

46. Given that Plaintiff had just been diagnosed with cancer and was facing an upcoming surgery, and Mr. Napper was aware of all that, this alleged choice was no choice at all if Plaintiff was going to remain employed.

47. Mr. Napper was very clear that the PIP would afford Plaintiff no authentic pathway to success.

48. Invariably, Mr. Napper would force the outcome of termination no matter how Plaintiff performed on the PIP.

49. Regarding the allegation that the demotion "pays…the same or more money…", Plaintiff contends this allegation is false in that Plaintiff can only make extra money, i.e., above and beyond the base rate of the hourly position, by working overtime.

50. Given that Plaintiff had just announced his cancer diagnosis, Mr. Napper was well aware this was not a realistic option for Plaintiff.

51. As a result, the demotion has resulted in a $12,000 per year pay cut.

52. O&M's Position Statement alleges that Plaintiff "received nearly two years' worth of performance coaching and subpar formal evaluations before he told Mr. Napper that he had been diagnosed with a medical condition."

53. Plaintiff asserts that his job performance did not merit the performance coaching and subpar formal evaluations of Mr. Napper; and he further contends, as noted above, that this allegation must be viewed in the context of his entire tenure at O&M, as well as the broader context.

54. For almost all of Plaintiff's tenure at O&M (i.e., the beginning of his employment until January 2021), Plaintiff received consistently positive job performance reviews from his General Managers.

55. Plaintiff was consistently seen as having very positive loyalty to the company, a strong work ethic, and meeting expectations without fail.

56. When Mr. Napper came on board, not only were there complaints from many employees about his (Mr. Napper's) unrealistic expectations and ineffective leadership style, but the employment culture was being shaken at its foundation by the Covid-19 pandemic.

57. Despite the complaints by many against Mr. Napper and then general malaise due to the pandemic, while non-salaried employees were being offered monetary incentives to come to work, as a salaried employee Plaintiff was working 12–14-hour days and six-to-seven-day workweeks with no additional monetary incentive.

58. Due to being fed up with Mr. Napper, some other employees quit, but Plaintiff continued to work as faithfully as ever.

59. O&M's Position Statement alleges that "Throughout 2021, Plaintiff consistently failed to perform his daily and specially assigned tasks. As a result, Mr. Napper was forced to routinely remind Plaintiff of the tasks he failed to complete. By way of example,

- On February 19, 2021, Mr. Napper had to remind Plaintiff that he and his team needed to shovel snow from the sidewalks and entrance to the DC.
- On June 4, 2021, Mr. Napper had to speak with Plaintiff about racks that the maintenance team installed in the DC. According to Mr. Napper, it was clear the racks were unstable and creating a safety issue. In response to Mr. Napper's inquiry, Plaintiff just shrugged his shoulders.
- On November 21, 2021, Plaintiff failed to respond to a text sent from Mr. Napper about an uncompleted task.

7

    • On November 28, 2021, despite prior instructions to do so, Plaintiff failed to report to work.

    • Although instructed to do so months earlier and despite numerous reminders from Mr. Napper, by December 2021, Mr. Napper still failed to oversee the installation (by a contractor that the DC had already engaged) of a security fence (to keep out unauthorized personnel)."

60. Regarding the events of February 19, 2021, Mr. Napper was not on scene when Plaintiff and his team (i.e., Maintenance Technician Ernest Jones) arrived at work early that morning.

61. O&M had a contracted snow removal service provided by the lawn care company, Naturally Green Lawncare, but Mr. Napper expected Plaintiff and Mr. Jones to take care of this situation rather than have the contractor perform their contracted service.

62. The two men worked to clean off sidewalks, entrances, exits, and the parking lot.

63. Plaintiff denies that he had to be reminded to perform these duties. Rather, he assumed, not surprisingly, that the contractor who had been retained by O&M to perform the snow removal service would be used to perform the service.

64. Regarding the events of June 4, 2021, following Mr. Napper's comment to Plaintiff on June 4, 2021, about the racks, Plaintiff spoke with Administrative Secretary Tammy Wainwright and learned that the account for the racks was with Memphis Material Handling (MMH).

65. Plaintiff made several calls to MMH but was unable to reach anyone to address the issue of the unsafe and unstable racks.

66. Frustrated with the fact that Plaintiff could not get in touch with anyone at MMH, Mr. Napper attempted to reach out to them also, yet he too was unable to get in touch with anyone at MMH about the issue.

67. Although Mr. Napper had been no more successful in his efforts than Plaintiff, Mr. Napper continued to instruct Plaintiff to contact MMH.

68. When Plaintiff responded that he could not reach anyone, Mr. Napper instructed Plaintiff to call someone else about it.

69. Plaintiff then consulted with Ms. Wainwright, but she responded that O&M was not opening any new accounts so there was no one else he could contact about the issue at that time.

70. Thus, the "shrugging of shoulders" was Plaintiff' way of communicating that he was attempting to address the situation but was being blocked by circumstances he could not control.

71. Mr. Napper understood this but as described above, was unrealistic in his expectations, and tended to blame employees for situations they could not control.

72. In another example of Mr. Napper's unrealistic expectations, he instructed Plaintiff and Mr. Jones to assemble shelving under the racks to better support freight.

73. This suggestion, however, was not realistic because the racks, which were already unsteady, certainly could not support further shelving in addition to the freight.

74. Although Plaintiff attempted to explain the futility of this, Mr. Napper insisted Plaintiff proceed with the plan until it failed for precisely the reason Plaintiff had indicated it would.

75. Regarding the events on November 21, 2021, it is first notable that Plaintiff has never been issued a company cell phone. Therefore, this allegation is evidently based

9

on the assumption that Plaintiff should respond to texts related to work on his personal cell phone.

76. Mr. Napper implemented a no cell phone policy on the warehouse floor. So even though he often sent out text messages to employees, it was understood that if employees used their cellphones on the warehouse floor, e.g., responded to texts, they would be written up for it.

77. Finally, as it pertained to Plaintiff specifically, in his role as Maintenance Supervisor, Plaintiff frequently was involved in tasks that prevented him from being able to access his cell phone, e.g., various maintenance duties that required hands-on focus and effort.

78. Although Plaintiff always made every effort to appropriately return phone calls and texts in a timely fashion, as noted several times above, Mr. Napper tended to be unrealistic in his expectations and to underestimate how busy Plaintiff was with tasks that prevented him from being able to immediately respond to calls or texts.

79. This same problem occurred regarding email and other forms of computer messages.

80. Since Plaintiff was often busy with hands-on tasks in a 558,000 square foot facility, he was often unable to respond to emails as quickly as Mr. Napper demanded.

81. Plaintiff contends that whereas previous general managers understood the balance that was inherent in Plaintiff' role, Mr. Napper was completely unrealistic in his expectations.

82. Regarding the events on November 28, 2021, Plaintiff contends this allegation is false.

83. Plaintiff has never failed to report to work.

84. For the past twenty years, Plaintiff has had a stellar attendance record.

85. Moreover, November 28, 2021, was a Sunday, and therefore not a day that Plaintiff was typically assigned to work.

86. Nevertheless, on that morning, since it was snowy/icy, Mr. Napper texted Plaintiff, stating that Plaintiff needed to go the store to get some ice melt. Plaintiff, therefore, asked Mr. Napper how the ice melt should be paid for.

87. Mr. Napper instructed Plaintiff to buy it and he would later be reimbursed for it by the company. Plaintiff went to Lowe's, but they were out of ice melt. He then went to Home Depot and obtained approximately forty bags of heavy ice melt. Plaintiff paid $238 for the ice melt and transported it back to the company.

88. The next workday, Plaintiff turned in the receipt for the purchase to Human Resources with the expectation that he would be reimbursed.

89. A couple of weeks later, Plaintiff inquired about the reimbursement. On his paystub, he noticed a "spot bonus" of $100. He sought clarification from Mr. Napper and Human Resources to no clear resolve. He was never reimbursed for the additional $138 and travel. Given all that, it defies logic to comprehend how Mr. Napper can argue that somehow Plaintiff was negligent in this situation.

90. Regarding the allegation that Plaintiff failed to oversee the installation of a security fence, plaintiff denies this allegation.

91. In response to Mr. Napper's instruction regarding the security fence, Plaintiff reached out numerous times to West Memphis Fence Company (WMFC) to have a fence installed.

92. Several times, WMFC Representative Andrew McGee gave Plaintiff dates when they planned to come perform the installation.

93. Unfortunately, WMFC kept postponing these dates, however, citing Covid-19's impact on their ability to maintain adequate staffing and to obtain materials from other manufacturers.

94. Plaintiff continued to address the situation but again was faced with circumstances beyond his, or anyone else's, control.

95. Again, Mr. Napper understood this but as described above, was unrealistic in his expectations, and tended to blame employees for situations they could not control.

96. O&M's Position Statement alleges that "As a result of Plaintiff' subpar performance, he received a "partially meets expectations" rating from Mr. Napper as part of his year-end 2021 performance review.

97. In that review, Mr. Napper noted that he had to "constantly remind [Plaintiff] to get tasks done" and that Plaintiff "must do a better job of getting tasks done in a timely manner.""

98. However, Mr. Napper never presented Plaintiff with a performance review document; he never asked Plaintiff if he agreed with any performance review document; and Plaintiff certainly never signed any job performance review document completed by Mr. Napper.

99. Mr. Napper talked generally about Plaintiff' job performance, but he never allowed Plaintiff to view any performance review document.

100. As already stated repeatedly, Mr. Napper's ability to evaluate appropriate expectations objectively and realistically was fundamentally flawed and he adamantly disagrees with the statements made by Mr. Napper on the performance review.

101. O&M's Position Statement alleges that "Despite his poor 2021 evaluation and coaching from Mr. Napper, Plaintiff' performance did not improve in 2022. Instead,

Mr. Napper was routinely forced to follow up with Plaintiff about uncompleted tasks. Yet again, however, despite Mr. Napper's regular inquiries, tasks assigned to Plaintiff would remain unfinished for months. By way of example, in July, Mr. Napper emailed Plaintiff about why racks that had been damaged in May, were still not fixed.2 And, on August 10, 2022, despite being instructed to do so weeks earlier, Plaintiff had still not installed cooling fans in the DC. Additionally, although requested and scheduled by Mr. Napper, Plaintiff routinely failed to show up for weekly status meetings with Mr. Napper."

102. Plaintiff contends these allegations are false and misleading, as described above.

103. Plaintiff worked tirelessly to accomplish many tasks and often was forced to deal with complex situations, sometimes due to difficulty with O&M contractors and sometimes due to circumstances related to the Covid-19 pandemic.

104. Regarding the cooling fans, Mr. Napper selected two cooling fans with the intention that they would cool the 558,000 square foot facility.

105. The type of fans Mr. Napper selected required consistent water flow to them to prevent their motors from overheating.

106. Plaintiff attempted to dissuade Mr. Napper from getting the fans, arguing that the requirement for a water supply would be a problem and that only two fans would not be sufficient to cool the large facility, but Mr. Napper insisted.

107. Ultimately the fans were returned after only two days because they were ineffective for the reasons Plaintiff had already stated.

108. Regarding attendance at meetings with Mr. Napper, Plaintiff contends the allegation made falsely characterizes what happened.

13

109. There were daily meetings attended by Mr. Napper and all the supervisors, including Plaintiff. In those meetings, Plaintiff, like all the other supervisors, gave updates on current events in his department.

110. Additionally, Mr. Napper instructed Plaintiff to meet with him (Mr. Napper) on a weekly basis, i.e., just the two of them.

111. Plaintiff concedes that at times his busy workload caused him to miss or show up late to a meeting with Mr. Napper.

112. When this occurred, Plaintiff made efforts to reschedule the meetings with Mr. Napper.

113. Yet, Plaintiff contends that even when he arrived at the appropriate time for meetings with Mr. Napper, they were often postponed because Mr. Napper was on the phone or out of the office.

114. Thus, although both parties were responsible for missed meetings, in keeping with his usual unrealistic approach, Mr. Napper absolved himself completely and held Plaintiff solely responsible.

115. O&M's Position Statement alleges that "Consequently, for year-end 2022, Plaintiff received a "does not meet expectations" rating. Mr. Napper again noted that Plaintiff was "someone that I constantly have to remind to get things done." Moreover, Mr. Napper commented that Plaintiff' work area "remains in disarray" and that Plaintiff "rarely ever shows up" for requested weekly one-on-one meetings. Mr. Napper also noted that despite having created a document for Plaintiff to track maintenance requests, the document "is rarely used" and tasks "go for long periods of time without being resolved.""

116. Plaintiff contends yet again that Mr. Napper's statements were borne out of his discriminatory animus.

14

117. As noted above, Plaintiff' team was composed of merely one technician, Mr. Jones.

118. Thus, the never ending, varied, and complex tasks required to maintain the 558,000 square foot facility were the responsibility of a two-man team.

119. Plaintiff maintains that whereas for most of his over two-decade tenure at O&M he consistently received stellar performance reviews, only when Mr. Napper rose to leadership did Plaintiff mystifyingly become the object of such abject derision.

120. O&M's Position Statement alleges that "Given Plaintiff' performance history, however, Mr. Napper did not believe Plaintiff could successfully complete a PIP, thereby necessitating the termination of Plaintiff' employment. Instead, since he did not want to fire Plaintiff, whom he personally liked, in late 2022 Mr. Napper began discussing with human resources ("HR") the possibility of demoting Plaintiff."

121. Plaintiff contends this this characterization of what occurred is false and disingenuous.

122. First, Mr. Napper frequently made negative and condescending remarks toward Plaintiff.

123. For example, at one point Mr. Napper said, "If you don't have a college degree, I have no use for you."

124. On another occasion, when Plaintiff noted how busy he was with various tasks, in response, Mr. Napper stated, "Woody, that is what weekends are for."

125. Therefore, the allegation that Mr. Napper "personally liked" Plaintiff seems dubious at best.

126. Moreover, the implication that demoting Plaintiff should have somehow been received with gratitude by Plaintiff is rich with irony.

127. Since Plaintiff adamantly rejects Mr. Napper's overall depiction of his (Plaintiff') job performance, he (Plaintiff) furthermore rejects Mr. Napper's allegation that Plaintiff could not successfully complete a PIP, or for that matter even that his job performance merited the implementation of a PIP in the first place.

128. Plaintiff accepted the demotion only in the sense that it was the only option available to him to remain employed.

129. O&M's Position Statement alleges that "On February 21, 2023, Mr. Napper, and Duana Smith ("Ms. Smith"), the HR Generalist that supported the DC, met with Plaintiff to present him with these options. During this meeting it was explained to Plaintiff that while he would become an hourly employee in his new role, he would likely make more money in his new position because he would be eligible for overtime pay. Plaintiff accepted the demotion on February 28, 2023, and remains in that role to this day."

130. Plaintiff denies the allegation that he was presented with any "options".

131. The only option Plaintiff had was to either accept the demotion or be terminated.

132. Plaintiff further asserts that the remark that he would be eligible to make more money with overtime was, again, a failed attempt to somehow get him (Plaintiff) to perceive the demotion as somehow not so bad.

133. Mr. Napper and the others present were obviously aware of Plaintiff' advanced age and cancer diagnosis, which obviously minimizes any likelihood that he would work overtime.

## CAUSES OF ACTION

### COUNT I: VIOLATION OF TITLE VII and 42 U.S.C. 1981 – RACE DISCRIMINATION

134. Plaintiff re-alleges and incorporates all averments set forth in paragraphs 1

16

through 133 above as if fully incorporated herein.

    135. Defendants have discriminated against Plaintiff because of his race based on the facts identified above which constitutes a violation of Title VII and 42 U.S.C. 1981.

    136. Plaintiff has suffered lost wages, benefits and other pecuniary losses as well as deep humiliation, axiety and emotional distress.

    137. The unlawful actions of Defendants complained of above were intentional malicious, and taken in reckless disregard of the statutory rights of Plaintiff, thus giving rise to both compensatory and puntive damages pursuant to Title VII and 42 U.S.C. 1981.

### COUNT II: VIOLATION OF THE ADEA – AGE DISCRIMINATION

    138. Plaintiff re-alleges and incorporates all averments set forth in paragraphs 1 through 137 above as if fully incorporated herein.

    139. Defendants have discriminated against Plaintiff because of his age based on the facts identified above which constitutes a violation of the ADEA.

    140. Plaintiff has suffered lost wages and benefits as a result of Defendants' discriminatory acts.

    141. The unlawful actions of Defendants complained of above were willlful and taken in reckless disregard of the statutory rights of Plaintiff, thus giving rise to liquidated damages pursuant to the ADEA.

### COUNT III:  VIOLATION OF THE AMERICANS WITH DISABILITIES ACT (ADA) – DISABILITY DISCRIMINATION

    142. Plaintiff re-alleges and incorporates all averments set forth in paragraphs 1 through 141 above as if fully incorporated herein.

    143. Defendants have discriminated against Plaintiff because of his disability based on the facts identified above which constitutes a violation of the Americans with

Disabilities Act.

144. Plaintiff has suffered lost wages, benefits and other pecuniary losses as well as deep humiliation, anxiety and emotional distress.

145. The unlawful actions of Defendants complained of above were intentional, malicious, and taken in reckless disregard of the statutory rights of Plaintiff. As such, Plaintiff is entitled to recover damages pursuant to the ADA.

## **PRAYER FOR RELIEF**

**WHEREFORE, PREMISES CONSIDERED,** Plaintiff respectfully prays that the Court cause service to issue in this cause upon the Defendants and that this matter be set for trial. Upon trial by jury thereon, Plaintiff prays that the following relief be granted:

1. Back wages;
2. Reinstatement or future pay in lieu of reinstatement;
3. Compensatory damages;
4. Punitive damages;
5. Liquidated damages;
6. Attorney's fees;
7. Lost benefits;
8. Pre-judgement and post-judgment interest;
9. Costs and expenses; and
10. Such further relief as is deemed just and proper.

THIS the 30th day of April 2024.

Respectfully submitted,

JAMES PARKS, PLAINTIFF

By: /s Louis H. Watson, Jr.
    LOUIS H. WATSON, JR. (MB# 9053)
    NICK NORRIS (MB# 101574)
    Attorneys for Plaintiff

OF COUNSEL:

WATSON & NORRIS, PLLC
4209 Lakeland Drive # 365
Flowood, Mississippi 39232-9212
Telephone: (601) 968-0000
Facsimile: (601) 968-0010
louis@watsonnorris.com
nick@watsonnorris.com